06-CV-01080-CMP

FILED ___ ENTERED
LODGED ___ RECEIVED

AUG 0 1 2006    DB

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EMMA SCHWARTZMAN, derivatively on
behalf of SAFECO CORPORATION, and in
her individual capacity as a shareholder

                    Plaintiff,

    v.

MICHAEL S. MCGAVICK, JOSEPH W.
BROWN, ROBERT S. CLINE, PETER L.S.
CURRIE, MARIA S. EITEL, JOSHUA
GREEN III, KERRY KILLINGER, GARY F.
LOCKE, WILLIAM G. REED, JR., JUDITH
M. RUNSTAD, and G. THOMPSON
HUTTON,

                    Defendants

    and

SAFECO CORPORATION,

                    Nominal defendant.

No. **CV06-1080** MJP

VERIFIED DERIVATIVE AND DIRECT
COMPLAINT FOR VIOLATION OF
THE EXCHANGE ACT AND FOR
BREACH OF FIDUCIARY DUTY BY
AUTHORIZING ACTS OF CORPORATE
WASTE AND *ULTRA VIRES* ACT

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACT
Case No.
006098-11   120018 v2

**ORIGINAL**

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1

**TABLE OF CONTENTS**

2

<u>PAGE</u>

3

I.   SUMMARY OF ALLEGATIONS ................................................................................1

4

II.   THE PARTIES .............................................................................................................5

5

III.   JURISDICTION ...........................................................................................................7

6

IV.   FACTUAL BACKGROUND........................................................................................7

7

    A.   McGavick's Employment Contract with Safeco Provided that
8        His Voluntary Resignation Would Make Him Ineligible for
9        Termination Payments.....................................................................................7

10     B.   Recognizing Their Fiduciary Duties, Defendants Promised That
       Objective Standards Would Govern McGavick's Compensation...........................9

11

12     C.   After Announcing His Voluntary Resignation, McGavick Remained
       in His Position Under the Terms of the 2005 Employment Contract....................13

13     D.   McGavick Was Required to Work Through December 31, 2005, at
14        the Generous Compensation Rate Established in the 2005
       Employment Contract.....................................................................................13

15     E.   Safeco's Shareholders Justifiably Relied on Negotiated Employment
16        Contracts, Including Negotiated Limitations on Executive
       Compensation, in Electing Board-Nominated Directors, in Approving
17        Board-Recommended Compensation Plans, and in Defeating
18        Shareholder Proposals to Limit Executive Compensation ...................................14

19     F.   Safeco's Board of Directors Signs an Executive Transition Services
       Agreement with McGavick that Constituted Extraordinary Corporate
20        Waste and Fraud ...........................................................................................17

21        1.   Under the Transition Agreement, McGavick was to provide
22            only an additional two months of "transition services"...............................17

23        2.   McGavick's Non-Compete Agreement Had a Little Value .......................17

24            a.   The Transition Agreement provided McGavick
25               with millions of dollars in disclosed and
              undisclosed compensation...........................................................18

26



3. The Transition Agreement concealed a significant
   portion of the compensation .................................................................19

4. Designating McGavick as an "employee" was an artifice
   because he was not a bona-fide employee during 2006 ...........................20

G. The Transition Agreement Was Not Supported by Exercise of
   Business Judgment .......................................................................................22

H. The 2006 Proxy Statement Concealed the Amount and Extraordinary
   Nature of the Payments Made Under the Transition Agreement ..........................23

I. Safeco Violated the 2005 Employment Contract Through its March
   2005 Stock-Option Grant to McGavick.....................................................27

V. DEMAND ON THE SAFECO BOARD IS EXCUSED AS FUTILE...............................27

VI. COUNTS ........................................................................................................29

COUNT I ...........................................................................................................29
Derivative Claim for Breach of Fiduciary Duty –
Corporate Waste and *Ultra Vires* Acts

COUNT II..........................................................................................................30
Direct Claim for Violation of Section 14(A) of the
Securities and Exchange Act of 1934

VII. CONCLUSION ................................................................................................33



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 11th Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

Plaintiff Emma Schwartzman brings this action derivatively on behalf of Safeco Corporation and individually in Count II as a shareholder of Safeco. She makes the following allegations upon information and belief, except as to the allegations relating to herself, which she makes upon personal knowledge.

## I.    SUMMARY OF ALLEGATIONS

1.     This is a derivative action by plaintiff, the great, great granddaughter of one of Safeco's founders and a holder of original Safeco shares, on behalf of Safeco Corporation ("Safeco" or the "Company") and Safeco shareholders. The claims herein arise from Defendants' violations of federal securities laws and corporate law arising from the extraordinary and wasteful payments Safeco made to its former Chief Executive Officer and Chairman Michael S. McGavick ("McGavick") in connection with his voluntary resignation from Safeco and his purported services during a two-month post-resignation period.

2.     Courts have recognized that paying a large severance payment to an outgoing executive may be appropriate – and is not "wasteful" – if the executive bargained for the severance payment when he first accepted employment, if it was reasonable at that time, and if the company became bound to pay it through the executive's employment contract. Courts have also recognized that lucrative, if not sky-high compensation, can be an appropriate exercise of a Board of Director's business judgment.

3.     This case presents the opposite factual scenario. On July 18, 2005, McGavick announced that he would resign from his position with Safeco effective August 31, 2005. He later agreed to remain through December 31, 2005. According to unambiguous terms of McGavick's Amended and Restated Employment Contract ("2005 Employment Contract"), his

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 1
Case No.
006098-11 120018 V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    voluntarily resignation from Safeco caused him to forfeit all compensation, including bonuses

2    and stock options. Safeco owed him only his final paycheck.

3         4.      But McGavick received far more than a final paycheck. Safeco's Board of

4    Directors approved and/or acquiesced to the transfer of as much as $28 million in compensation

5    to McGavick in 2006 – for working, at most, a few days in 2006, as described below. These

6    payments included multi-million dollar bonuses and stock option packages, even though under

7

8    the clear terms of his employment contract he had forfeited the right to these exact benefits.

9         5.      Much of the largesse bestowed on McGavick stems from McGavick's Executive

10   Transition Services Agreement, dated December 6, 2005 ("Transition Agreement"). Pursuant to

11   the Transition Agreement, for two months' effort in January and February 2006, Safeco paid

12   McGavick a bonus of $2,314,180, granted vested options worth $3.3 million and McGavick was

13

14   provided other forms of compensation as described below. These multi-million dollar payments

15   were for his services during a two-month period during which McGavick, by his own admission,

16   was engaged full-time as a candidate for the United States Senate. Safeco's award of those

17   amounts violated the Board of Director's Code of Corporate Conduct with respect to factors that

18   Board Members must consider when deciding appropriate levels of compensation.

19        6.      In filings with the Securities and Exchange Commission, all Defendants

20   represented to shareholders and regulators that Safeco would pay McGavick $3.3 million in

21

22   equity under the Transition Agreement. These filings, however, concealed the critical fact that

23   by calling McGavick an "employee" for the first two months of 2006, the Transition Agreement

24   transferred an even greater amount of equity to McGavick than $3.3 million. The *only reason*

25   for McGavick to be called an "employee" during this period was to allow him to receive millions

26

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 2
Case No.
006098-11 120018 V2


HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

of dollars of additional stock options, which vested in late February 2006. Even if McGavick had not forfeited this stock by resigning in 2005, he was not a bona-fide employee after he stepped down as a corporate officer at the end of 2005.[1]  This lack of disclosure concealed the equity value of the Transition Agreement and the extraordinary largesse being given to McGavick.

7.    The Defendants had also promised Safeco shareholders in written proxy materials that compensation would be determined via principled decision-making process that carefully considered among other factors shareholders' long-term interests and how peers were paid, and would employ a "pay for performance" rule. The Transition Agreement, by transferring at least $8.5-9 million to McGavick for little or no actual services (since he was a full-time candidate for the Senate during the transition period), violated each of these factors/principles and Safeco's code of corporate conduct.

8.    The payments awarded under the Transition Agreement were so utterly out of proportion to McGavick's remaining contribution to Safeco – at most, two months of part-time work – that it constituted a waste of corporate assets and was *ultra vires*. Safeco's Board of Directors violated its duties to shareholders by approving this unearned and unlawful transfer of funds and by failing to exercise any reasonable business judgment in approving this award.

9.    McGavick was a full participant in this corporate waste. He had negotiated the 2005 Employment Contract and fully understood that his voluntary resignation made him ineligible for a "golden parachute" or large termination payment. Indeed, he was acutely aware

---

[1] In contrast, when Mr. McGavick's predecessor, Mr. Roger H. Eigsti, resigned as President and CEO on December 31, 2000, his employee status ended on that same date. *See* Separation Agreement between Rogher Eigsti and Safeco, filed with SEC on Form 10-K annual filing on March 19, 2001.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 3
Case No.
006098-11 120016 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    of this fact, because he had forfeited bonuses and options from his previous employer when he

2    resigned to join Safeco.

3        10.    McGavick thus looted Safeco on his way out the door, breaching his fiduciary

4    duties to Safeco and its shareholders, even after the Company had compensated him generously

5    for his work. The Board acquiesced to this malfeasance.

6

7        11.    The accounting and reporting of his 2006 payout is so irregular as to apparently

8    be unclear even to McGavick, whose official disclosures of 2006 income from Safeco have

9    ranged from $15 million to $28 million. Shareholders are entitled to know the facts.

10       12.    Based upon the violations described herein, plaintiff seeks from McGavick a full

11   accounting of the compensation paid to him for 2006 and a return of any ill-gotten gains to

12   Safeco and its shareholders, including but not limited to the bonuses and options paid under the

13

14   Transition Agreement which were improperly granted and whose transfer to McGavick

15   constituted a waste of corporate assets.

16       13.    Well aware that their malfeasance would be material to Safeco shareholders, the

17   Safeco Director Defendants sought to protect their positions on the Safeco Board by concealing

18   their misconduct in Safeco's proxy statement issued to shareholders in May 2006. Six of the

19   directors were seeking reelection to the Board at that time. The proxy statement concealed their

20   misconduct from shareholders while soliciting the shareholders' votes for them. And

21   shareholders, kept uninformed of the directors' malfeasance by the misleading proxy statement,

22   reelected those six directors to new terms on the Safeco Board. Plaintiff seeks a corrective proxy

23   statement and a new election of these directors pursuant to a fair proxy statement.

24

25

26

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 4
Case No.
006098-11 120018 V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE. SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

## II.    THE PARTIES

14.    Plaintiff Emma Schwartzman is a resident of Washington State. She holds original Safeco shares that have been passed through her family for generations. In 1923, plaintiff's great, great grandfather was a founder of the General Insurance Company of America Corporation, which later became Safeco Corporation.

15.    Nominal Defendant Safeco Corporation ("Safeco") is a Washington Corporation with its principle executive offices located at Safeco Plaza, 4333 Brooklyn Avenue NE, Seattle, Washington. Safeco's shares are publicly traded on the NASDAQ exchange.

16.    Defendant Michael S. McGavick ("McGavick") is a former CEO and Chairman of Safeco and is a resident of Washington State.

17.    Defendant Joseph W. Brown ("Brown") is the non-executive chairman of the board of Safeco. Mr. Brown has been a member of the Safeco board since 2001. Mr. Brown has served as chairman of MBIA, Inc. since 1999 and served as MBIA's CEO from 1999 to May 2004. Mr. Brown is a resident of New York.

18.    Defendant Robert S. Cline ("Cline") has been a director of Safeco since 1992. Mr. Cline was Chairman and CEO of Airborne, Inc., from 1984 until May 2002. Mr. Cline is a resident of Washington State.

19.    Defendant Peter L.S. Currie ("Curie") has been a director of Safeco since July 2005. Mr. Currie is president of Currie Capital LLC. Mr. Currie is a resident of California.

20.    Defendant Maria S. Eitel ("Eitel") has been a director of Safeco since August 2005. Since 2004, Ms. Eitel has been the president of the Nike Foundation and corporate advisor to Nike, Inc. Ms. Eitel is a resident of Washington State.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 5
Case No.
006098-11 120018 V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

21.     Defendant Joshua Green III ("Green") has been a director of Safeco since 1981. Mr. Green is Chairman and CEO of the Joshua Green Corporation. Mr. Green is a resident of Washington State.

22.     Defendant Kerry Killinger ("Killinger") has been a director of Safeco since January 2003. Mr. Killinger is the Chairman and CEO of Washington Mutual, Inc. Mr. Killinger is a resident of Washington State.

23.     Defendant Gary F. Locke ("Locke") has been a director of Safeco since February 2005. Mr. Locke is a partner in the Seattle law firm of Davis Wright Tremaine LLP. Mr. Locke served as the Governor of Washington State from 1997 to 2005 and is a resident of Washington State.

24.     Defendant William G. Reed, Jr. ("Reed") has been a director of Safeco since 1974. Mr. Reed served as Safeco's Lead Director from May 2000 until the 2004 annual meeting. Mr. Reed was Chairman of the Board of Directors of Safeco from January 30, 2001 until January 1, 2003. Mr. Reed is a resident of Washington State.

25.     Defendant Judith M. Runstad ("Runstad") has been a director of Safeco since 1990. Ms. Runstad has been Of Counsel at the Seattle law firm Foster Pepper PLLC since 1998 and was Partner with the firm from 1978 to 1998. Ms. Runstad is a resident of Washington State.

26.     Defendant G. Thompson Hutton ("Hutton") was a director of Safeco from January 2004 until March 2006. Mr. Hutton is a private equity and venture capital investor and Managing Partner of Thompson Hutton LLC. Mr. Hutton is a resident of California.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 6
Case No.
006098-11 120018.V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623 0594

27.     Collectively Brown, Cline, Curie, Eitel, Green, Killinger, Locke, Reed, Runstad and Hutton are referred to as the "Director Defendants."

28.     By virtue of Defendants' position as present or former directors, they have been in a fiduciary relationship to Safeco and the Company's public shareholders, and owed to Safeco and its public shareholders the highest obligation of good faith, fair dealing, due care and candor, and had an obligation to protect and preserve Safeco's assets and interests.

### III.     JURISDICTION

29.     Jurisdiction is based on § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this case arises from Defendants' violation of § 14 of the Exchange Act, 15 U.S.C. § 78n, and the rules promulgated there under by the SEC.

30.     This court may exercise supplemental jurisdiction over the state-law claims asserted herein under 28 U.S.C. § 1367, as such claims arise from the same nucleus of operative facts as the federal claims asserted below.

31.     The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court that it otherwise would not have.

### IV.     FACTUAL BACKGROUND

**A.     McGavick's Employment Contract with Safeco Provided that His Voluntary Resignation Would Make Him Ineligible for Termination Payments**

32.     Safeco's first employment contract with Mike McGavick, executed on January 26, 2001 ("2001 Employment Contract"), was the product of hard negotiations. It was renegotiated two times, with the 2005 Employment Contract executed on January 5, 2005 ("2005 Employment Contract"), only seven months before McGavick announced his resignation.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 · SEATTLE, WA 98101
TELEPHONE (206) 623-7292 · FACSIMILE (206) 623-0594

33.     In entering the 2001 and 2005 Employment Contracts, Safeco and McGavick specifically negotiated the "Termination Payment" he would receive upon leaving his position at Safeco.[2] The size of McGavick's termination payments depended upon the circumstances of the termination, and could be as high as $5 million if Safeco terminated McGavick without cause during his first three years. 2001 Employment Contract, ¶ 6.1.[3]  If McGavick's employment was terminated in connection with a change of corporate control, he would receive a more generous payment, typically referred to as a "golden parachute." *Id.*, ¶ 6.4.

34.     McGavick's employment contracts were clear, however, that he would not be entitled to a generous termination payment if he voluntarily resigned from his position:

> 6.2     TERMINATION BY EMPLOYEE
> In the case of the termination of Employee's employment by Employee, Employee shall not be entitled to any payments hereunder, other than those set forth in clauses (i)(b) or (ii)(b) of subsection 6.1 hereof.

*Id.*, ¶ 6.2.  Clauses (i)(b) and (ii)(b) allow payment of only "any unpaid annual base salary which has accrued for services already performed as of the date termination of Employee's employment becomes effective." *Id.*, ¶ 6.1.  The 2005 Employment Contract contained identical provisions. 2005 Employment Contract, ¶¶ 6.1, 6.2.

35.     This provision of McGavick's employment contract, under which McGavick's voluntary resignation caused him to forfeit compensation, is common.  McGavick was acutely

---

[2] It provided that "in the event of termination of the employment of Employee, all compensation and benefits set forth in this Agreement shall terminate except as specifically provided in this Section 6." 2001 Employment Contract, ¶ 6, 2005 Employment Contract, ¶ 6.

[3] If Safeco terminated McGavick without cause during the first three years, McGavick would be entitled to a termination payment equal to three years base salary and target bonus. *Id.*

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 8
Case No.
006098-11  120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   aware of this fact because he forfeited his bonus for his final year of work, stock options and

2   cash bonuses when he resigned from his previous employment at CNA Corporation.[4]

3       36.     Safeco assured its stockholders that employees resigning their position would

4   forfeit their stock options. For example, in seeking shareholder approval of the Safeco Long-

5   Term Incentive Plan of 1997 ("LTIP"), as Amended and Restated February 2, 2005, the proxy

6   statement soliciting shareholder support stated:

7

8       *If the holder of an RSR [Restricted Stock Right] fails to attain*
        *the performance goals or satisfy the employment or service*
9       *requirements of the RSR (for instance, if the holder is terminated*
        *or resigns), the holder loses the right to receive stock or cash*
10      *under the RSR*, except if a holder of an RSR dies, retires, or
        becomes disabled before satisfying such requirements.

11  Safeco Proxy Statement filed March 24, 2005, p. 7 (emphasis added) ("2005 Proxy Statement).

12  **B.    Recognizing Their Fiduciary Duties, Defendants Promised That Objective**
13  **       Standards Would Govern McGavick's Compensation**

14      37.     In the 2005 Proxy Statement sent to Safeco shareholders, Defendants promised

15  that the Board approached compensation in an objective and strategic manner:

16      **Compensation Committee Report on Executive Compensation**

17      We, as the Compensation Committee of the Board of Directors,
        oversee the company's compensation and benefit programs to
18      ensure those programs appropriately motivate employees to
        achieve superior performance and shareholder value. We annually
19      review the Chief Executive Officer's performance and compare it
        to pre-established performance goals and objectives. We approve
20      compensation for executives, set the pay program for employees
        and oversee the senior management succession planning process.

21

22                              * * *

23      **Approach to Compensation**

24      We based our compensation decisions on these core principles:

25  [4] The 2001 Employment Contract anticipated that McGavick's voluntary resignation from his previous
    employment at CNA Corporation would cause him to forfeit his calendar-year 2000 bonus, stock option value, and
26  long-term cash bonuses from CNA. 2001 Employment Contract, ¶¶ 3.2(c), 3.4.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 9
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

- **Pay for Performance**

We pay for performance. We want total compensation to rise above industry norms when we achieve superior performance. We target base salaries for the Named Executive Officers at the median of our peers, including most of the companies in the S&P 500 Property & Casualty Insurance Index, or S&P Insurance Index. We target long-term compensation at the 50th percentile of our peers with an opportunity to receive awards at or above the 75th percentile for superior results.

- **Pay Competitively**

We pay at levels and with types of compensation with our peers. We evaluate company performance and individual compensation and compare them with comparable data from our peers. To confirm that executive compensation continues to be competitive given our lines of business, size and the geographic location of our executive officers, we review information regarding compensation practices of our competitors (including most of the companies that are in the S&P Insurance Index as well as other competing companies of a similar size to us). In addition, we review information concerning executive compensation practices and compensation levels obtained from (i) three independent consulting firms retained by us or Safeco's Human Resources department, and (ii) the proxy statements of publicly held companies.

We also annually review data that compares the cumulative total return to our shareholders with the S&P 500 Index. We compare these returns with the returns of companies in the same general lines of business. On page 27 is a graph that compares the cumulative total return to our shareholders with the S&P 500 Index and the S&P Insurance Index, with the returns of the companies in the S&P Insurance Index each weighted according to each component company's respective market capitalization.

- **Link Compensation to Shareholder Interests**

We link executive compensation to shareholder interests. We use return on equity as a performance element for bonuses and awarding RSRs. In 2004, we changed our stock-based incentive program to strengthen the link with our shareholders' long-term interests. We decided to make future equity grants to existing employees only in the form of performance measure RSRs, where the number of RSRs granted will be determined by identified performance measures. These changes are described in more detail under "Stock-Based Incentive Program."

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

38.   Specifically, as to Mr. McGavick, the Board promised that his compensation was

based on a careful consideration of his performance:

- **Performance Factors**

  … We generally took into account the following factors when
  considering Mr. McGavick's 2004 compensation:  (i) the
  cumulative total return to our shareholders; (ii) customary financial
  measures (e.g., the compounded annual return to shareholders, our
  common stock price and the common stock prices of comparable
  companies); (iii) the combined ratio of Safeco's property and
  casualty subsidiaries and the combined ratios of competitors;
  (iv) the revenue and premium growth of our operating subsidiaries;
  (v) our financial strength; and (vi) the ratings assigned to us and
  our subsidiaries or securities by A.M. Best Insurance Services,
  Standard & Poor's Ratings Group, Moody's Investors Service, Inc.
  and Fitch, Inc.  We also reviewed Mr. McGavick's achievement of
  leadership goals that we first set for him at the beginning of the
  year.

- **Elements of Compensation**

  ***Salary.***  We increased Mr. McGavick's base salary from
  $1,000,000 to $1,150,000 for 2005.

  ***Bonus.***  We decided to pay Mr. McGavick a bonus for 2004, based
  on Safeco's surpassing its return on equity and operating earnings
  per share targets for 2004, as well as a number of other factors.
  Our decision included an assessment of Mr. McGavick's
  leadership, his ability to foster and maintain a strong, positive and
  high-integrity culture, and his continued ability to develop and
  implement strategies to enhance long-term shareholder value.  We
  also considered Mr. McGavick's personal performance against pre-
  established qualitative goals in a number of areas, including
  diversity, the divestiture of our life and investments operations,
  implementation of a workforce management program, and
  corporate governance.  Under Mr. McGavick's employment
  agreement, the maximum bonus for Mr. McGavick is 240% of
  base salary.  Based on the quantitative and qualitative factors
  discussed above, we approved a bonus for 2004 performance of
  200% of Mr. McGavick's base salary.

  ***Long-Term Incentive Compensation.***  Based on 2003 performance
  and during the 2004 transition year for our stock-based incentive
  program, we awarded Mr. McGavick a grant of 98,944 RSRs with
  a value of $4,333,747 on the date of grant as described in the
  "Summary Compensation Table."  Based on 2004 performance, we
  awarded Mr. McGavick a grant of 72,848 PM-RSRs with a value
  of $3,587,036 based on the closing price of our shares on
  March 11, 2005.  Currently, there is no limit on the number of



shares or share equivalents that may be granted to Mr. McGavick, subject to plan limits under the LTIP. However, the PIC Plan will establish a maximum number of 300,000 shares or share equivalents that may be granted to Mr. McGavick (see page 5).

**Review of All Elements of CEO Compensation**

For the 2004 fiscal year, the economic value of Mr. McGavick's total compensation, which is composed of base salary, bonus, perquisites, equity grants and retirement benefits was $8,854,089, down approximately 3.3% from $9,159,063, the economic value of Mr. McGavick's aggregate compensation for 2003. We reported on our evaluation of Mr. McGavick's 2004 compensation to the non-employee directors of the board.

39.     Based on all of these factors, McGavick has been handsomely rewarded --

$8,854,089 in 2004 and $9,159,063 in 2003.

40.     Another way to look at these promises to the Safeco shareholders is that they set

forth principles that the Board adopted in setting compensation that reflect the Board's fiduciary

duty to carefully and prudently award compensation and to not waste corporate assets.

41.     The 2005 Proxy Statement also incorporated Safeco's policies on corporate

governance, which can be found at www.safeco.com/governance. Set forth on this website is the

Compensation Committee Charter, which provides that the Committee *shall* consider various

factors in compensating the CEO:

> 6.     With respect to the compensation of the CEO; the committee shall annually establish financial and leadership goals and objectives relevant to the CEO's compensation, evaluate performance in light of those goals and objectives and approve changes in compensation, including awards under cash and equity based programs. Among the elements the committee shall consider in connection with the annual and long-term incentive component of the CEO's compensation are: Safeco's absolute and relative performance, the value of similar awards to CEOs of comparable companies and the awards made to the CEO in prior years.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 12
Case No.
006098-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**C.   After Announcing His Voluntary Resignation, McGavick Remained in His Position Under the Terms of the 2005 Employment Contract**

42.     Only seven months after entering the 2005 Employment Contract and earning more than $8 million for 2004, McGavick announced that he would resign from Safeco as of August 31, 2005, to run for the United States Senate. On July 18, 2005, Safeco filed a Form 8-K with the SEC including a notice of this announcement.

43.     On August 31, 2005, Safeco notified the SEC that "Mr. McGavick has agreed to retain the title until a successor is named. He will serve as chairman of the board and will provide other transition leadership as needed at least through the end of this year."[5]

44.     The 2005 Employment Contract continued to govern the terms of McGavick's continuing employment and compensation. Safeco and McGavick did not amend the 2005 Employment Contract or notify the SEC or shareholders of any new agreement. Instead, McGavick's decision to remain with Safeco through the end of the year constituted a postponement of his voluntary resignation and a withdrawal of any notice of termination that may have been imputed to his resignation announcement.

**D.   McGavick Was Required to Work Through December 31, 2005, at the Generous Compensation Rate Established in the 2005 Employment Contract**

45.     Under to the terms of the 2005 Employment Contract, McGavick could terminate his employment only through giving written "Notice of Termination." 2005 Employment Contract, ¶ 5.2. The contract provided that after giving this required notice, McGavick was required to continue in his position as CEO and continue performing services for an additional 30 days. *Id.*, ¶ 5.4.

---

[5] SEC Form 8-K/A, Amendment No. 1, filed August 31, 2005.

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

46.     Although McGavick publicly announced his resignation and subsequently amended such announcement, he did not give Notice of Termination to Safeco at any time before December 1, 2005.  On December 7, 2005, Safeco filed with the SEC a notice stating that on December 1, 2005, Safeco's Board of Director's "accepted the resignation of Mike McGavick as a director and Chairman of the Board and as President and Chief Executive Officer, effective December 31, 2005; Safeco has no disagreements with Mr. McGavick."[5]  Therefore, under the notice and the 2005 Employment Contract, he was obligated to continue to perform services as CEO through the end of 2005 at his existing compensation levels.  He had no right to bargain for additional compensation for providing such services.  His obligation was to perform such services full-time and exclusively for Safeco's benefit.

E.     **Safeco's Shareholders Justifiably Relied on Negotiated Employment Contracts, Including Negotiated Limitations on Executive Compensation, in Electing Board-Nominated Directors, in Approving Board-Recommended Compensation Plans, and in Defeating Shareholder Proposals to Limit Executive Compensation**

47.     Throughout the period of McGavick's tenure as CEO, the Board sent proxy statements to Safeco shareholders that were intended to increase shareholder confidence in the Board's accountability for executive compensation.  The shareholders justifiably relied upon such accountability measures, including the negotiated limitations contained in McGavick's employment contract, to approve the Board's recommendations relating to Board nominees and Board and shareholder-initiated proposals relating to executive compensation.

---

[5] To the extent that any notice was imputed to McGavick's August announcement, such notice was retracted by McGavick's decision to remain in his position until a successor was appointed.  Safeco's next notice on the subject was its Form 8-K filing on December 7, 2005, which stated "On December 1, 2005, Safeco's Board of Directors accepted the resignation of Mike McGavick as a director and Chairman of the Board and as President and Chief Executive Officer, effective December 31, 2005; Safeco has no disagreements with Mr. McGavick."



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

48.    The 2002 and 2005 Proxy Statements solicited shareholder approval for amendments to compensation policies that included executive compensation. In 2002, the shareholders approved an amendment to Safeco's LTIP (defined *supra* at 9) to double the number of shares available and substantially increase the shares that the Board could issue to any particular employee. In 2005, the Board solicited shareholder approval of an executive Performance Incentive Compensation ("PIC") Plan, and further amendments to the LTIP.

49.    The Board-recommended LTIP amendment increased the use of Restricted Stock Rights ("RSRs") and Performance Stock Rights ("PSRs"). The Board assured shareholders that these incentives would *not* be used for terminated employees. It specifically stated that a holder of a RSR would forfeit that right by resigning, and that if "the recipient terminates service before the end of the specified service requirement, the PSR will expire and the holder has no further rights under the PSR." 2005 Proxy Statement, pp. 7, 8.

50.    Proxy statements issued in 2003 and 2004 solicited votes on shareholder-initiated proposals to limit executive compensation. The Board recommended that both of these proposals be defeated based upon its assurances that these reforms were not necessary to control executive compensation and that flexibility as to executive compensation would be used to "recruit and retain" executives. For example:

> Safeco's approach to executive compensation gives the Compensation Committee the *flexibility to fashion option grants in the manner it believes to be necessary to attract and retain the senior executives* essential to Safeco's future success. *Restricting this flexibility by imposing rigid terms and conditions on the grant of stock options would place Safeco at a competitive disadvantage in recruiting and retaining executives* and would not be in the best interest of shareholders.

Proxy Statement filed March 21, 2003, p. 27 (emphasis added) ("2003 Proxy Statement").

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 15
Case No.
006698-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ◆ SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ◆ FACSIMILE (206) 623-0594

51.     In a 2004 proxy statement, the Board persuaded shareholders to defeat what was called the "commonsense executive compensation proposal." The measure's proponents sought to limit base salary and stock options for the CEO, and sought to impose vesting requirements for all options. They argued that as of 2002, the CEO-worker pay gap of 282-to-1 was nearly seven times larger than the 1982 ratio of 42-to-1.

52.     The Board solicited votes against this proposal, arguing specifically that the Board had already decided to move from awarding stock options to awarding Restricted Stock Rights and Performance Stock Rights, and that both "*will be subject to time-based vesting and settle in 25% increments.*" *Id.*, p. 31 (emphasis added). The Board again argued that compensation was used to "attract and retain" and that "the shareholder proposal would undermine the long-term interests of shareholders by adversely affecting Safeco's ability *to attract and retain* the most qualified executives needed to manage the business." *Id.* at p. 31 (emphasis added).

53.     Both proxy statements described McGavick's employment agreement and analyzed these proposals in the context of McGavick's negotiated compensation package. The proxy statements also outlined Safeco's compensation policies which, as discussed herein, focus on recruiting and retaining executives and their performance. In contrast, nothing in the proxy statements suggested that the Board would have the authority to give millions of dollars in unearned compensation to an executive after he has resigned, and therefore unrelated to attracting or retaining him, and in excess of what he was entitled to under his employment agreement.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 16
Case No.
006698-11 120018 V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

54.     Both proxy statements also sought and received shareholder approval for a slate of Board candidates put forward by the Board of Directors.

**F.    Safeco's Board of Directors Signs an Executive Transition Services Agreement with McGavick that Constituted Extraordinary Corporate Waste and Fraud**

55.     On December 6, 2005, Safeco's Board of Directors and McGavick entered into an Executive Transition Services Agreement ("Transition Agreement"). Director Joseph W. Brown executed the Transition Agreement on behalf of the Board of Directors, and on December 7, 2005, it was filed with the SEC.[7]

56.     The Transition Agreement, described in detail below, was an extraordinary feat of corporate waste and fraud. It authorized the improper transfer of millions of dollars of Safeco's assets to McGavick as unearned compensation. While a portion of this payment was disclosed, the Transition Agreement was artfully drafted to conceal a significant portion of the payment.

**1.     Under the Transition Agreement, McGavick was to provide only an additional two months of "transition services"**

57.     The Transition Agreement provided Safeco with virtually no consideration. McGavick was already required to remain in his position until the end of 2005 at his existing compensation rate. McGavick merely agreed to also provide "such transitional support to the successor Chief Executive Officer as the Safeco Board of Directors deems appropriate" during the first two months of 2006. Transition Agreement, ¶¶ 1, 2.

**2.     McGavick's Non-Compete Agreement Had a Little Value**

58.     McGavick was already subject to a one-year agreement not to compete with Safeco. 2005 Employment Contract, ¶ 7. Although the Transition Agreement extended this agreement to three years, Transition Agreement, ¶ 7, this was not worth millions of dollars to

---

[7] On that day, Safeco announced that Brown would succeed McGavick as chairman of the Safeco Board.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 ▪ Seattle, WA 98101
TELEPHONE (206) 623-7292 ▪ FACSIMILE (206) 623-0594

Safeco. Furthermore, as of December 2005, it was well known to Defendants and the public at large that McGavick would be running for the United States Senate, a campaign that would take him through Fall of 2006, accounting in any event for at least one year of his non-compete term of three years. In fact, McGavick's original 2001 Employment Contract contained a three-year non-compete agreement. 2001 Employment Contract, ¶ 7.2.[8]

### a. The Transition Agreement provided McGavick with millions of dollars in disclosed and undisclosed compensation

59.     Even though McGavick had forfeited all rights to a termination payment, the Transition Agreement awarded McGavick with extraordinary termination payments, in addition to a generous salary.

60.     Under the Transition Agreement, Safeco would pay McGavick a base salary of $62,500 for the month of December 2005 while he remained President and Chief Executive Officer. Safeco would then pay McGavick $8,333 per month in January and February, 2006.

61.     The Transition Agreement provided that Safeco would accelerate the vesting of McGavick's options to 210,298 Safeco shares, effectively transferring approximately $3.3 million to McGavick. This was extraordinary in two respects. First, the 2005 Employment Contract required McGavick to forfeit these options by resigning. Second, even if these options remained valid, they were not vested when McGavick left Safeco, so they were to be forfeited by their own terms.

62.     Further, by resigning, McGavick had forfeited his right to a 2005 bonus. But under the Transition Agreement, Safeco also paid McGavick a bonus in the amount of

---

[8] When it was reduced to one year in 2005, the Board told shareholders that this change was proposed by McGavick to *reduce* his severance payments upon his termination, so it cannot now be used to justify a multi-million dollar payment to McGavick. *See* Safeco 2003 Proxy Statement, at p. 24.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 18
Case No.
006098-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

$2,314,180.[9]  Moreover, McGavick had already been excessively compensated for providing "transition services" through February 2006, so it was waste for the Board to provide a multi-million bonus for these same services.

63.    In prior proxy statements, McGavick and the Director Defendants had promised shareholders that compensation would be tied to certain criteria, none of which were satisfied or even examined by the Director Defendants in granting these options. For example, the granting of McGavick shares and a bonus of $2,314,180 does not meet the core principles of "pay for performance," "pay competitively," or "link compensation to shareholder interests." Under the core principle "pay competitively," the Director Defendants were to "pay at levels and with types of compensation that are competitive with peers." No peers, given McGavick's resignation and other commitments during this period, would be granted the millions in compensation that the Transition Agreement provided.

### 3.    The Transition Agreement concealed a significant portion of the compensation

64.    The Transition Agreement concealed significant portions of the McGavick's compensation. Although McGavick would leave his position as of December 31, 2005, the Transition Agreement stated that McGavick would "provide transition services *as an employee* until February 28, 2006." Transition Agreement, ¶ A (emphasis added).

65.    By allowing McGavick to be called an "employee" for the first two months of 2006, Safeco granted millions of dollars to McGavick in additional compensation that he should have forfeited. For example, McGavick became vested in approximately $3 million in Restricted Stock Rights for remaining an employee into late February, the anniversary and vesting date for

---

[9] 2006 Proxy Statement.



1   such grants.  In addition, under one stock-option grant, McGavick became vested in an additional

2   $160,000 in options *every month* he remained an employee.

3       66.     The Transition Agreement was artfully drafted to avoid disclosure of these

4   additional payments.  For example, it suggested that the only equity granted to McGavick under

5   the Transition Agreement was Safeco's acceleration of $3.3 million in options and that he was

6   forfeiting all options not vested upon the separation date.  It artfully concealed, however, the

7   larger value of equity being transferred by virtue of allowing McGavick to remain an

8   "employee" through February – compensation that was directly contrary to the compensation

9   limits bargained for in the 2005 Employment Contract.

10

11      **4.    Designating McGavick as an "employee" was an artifice because he was not a
12           bona-fide employee during 2006**

13      67.     In fact, McGavick was not a bona-fide employee during 2006.  He was, rather, a

14  full-time candidate for the United States Senate during this period.  If McGavick provided any

15  services to Safeco during 2006, they were *de minimis* and without significant value, and the

16  Director Defendants were aware that McGavick, rather than acting as a full-time transitional

17  CEO, was a full-time candidate for political office.  For example, while he was supposedly

18  acting as a multi-million dollar transitional CEO, in January 2006 McGavick launched a

19  statewide tour of 18 communities.  Then, on February 2, 2006, while he was being paid multi-

20  millions of dollars under the Transition Agreement, he admitted his true status as a full-time

21  candidate:  "The bottom line is until the end of the year I was still CEO of Safeco and very much

22  a part-time candidate."  Now "I can be a full time candidate and that's a wonderful change, so

23

24

25

26

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   we're feeling very good about the campaign."[10]   Indeed, McGavick's February 2006 Campaign

2   schedule proves that he was a full-time candidate.  It included stops in the following counties:

3       February 3rd:  Walla Walla
4       February 4th:  Asotin
        February 4th:  Benton/Franklin
5       February 10th:  Clark
        February 11th:  Yakima
6       February 12th:  Whitman
7       February 18th:  Skagit/Whatcom
        February 24th:  Grays Harbor
8       February 25th:  Chelan/Douglas

9       McGavick's reporting to the Federal Elections Commission also reflects that he was a

10  full-time candidate:  he raised $1.2 million during the first quarter of 2006.  Indeed it was a

11  "wonderful change" to be both a full-time candidate and a part-time CEO collecting over

12  $28 million in payments.

13
14      68.     During this period, McGavick also was not an employee within the meaning of

15  the stock-option grants.  Those grants and their vesting dates were designed to reward McGavick

16  for remaining the CEO and Chairman of Safeco, not to be used as an artifice to grant additional

17  unearned payments after McGavick's resignation.  This is clear from the 2001 and 2005

18  Employment Contracts under which the options were granted.  They define McGavick's

19  employment as his employment as "Safeco's President and Chief Executive Officer," performing

20  "duties customarily performed by the chief executive officer."  See 2005 Employment Contract,

21  ¶ 1.
22

23      69.     The use of the employee artifice was designed to mislead shareholders and to

24  avoid disclosure under federal and state corporate laws, including without limitation the

25

26      [10] http://www.kgw.com/sharedcontent/APStories/stories/D8FGN27G1.html (lasted accessed 7/27/2006).

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 21
Case No.
00B490N-11  120016 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

Sarbanes-Oxley Reform Act. Had McGavick and the Director Defendants' acted openly and honestly, they would have proposed to accelerate those millions of options scheduled to vest in February 2006, and disclosed such acceleration. But then shareholders would have known about the equity transferred under the Transition Agreement. By using the "employee" artifice, Safeco and McGavick concealed at least half the equity transfer made under the Transition Agreement, and led shareholders and regulators to believe only $3.3 million in equity was transferred.

70.     The 2006 bonus, the acceleration of options under the Transition Agreement, and the granting of restricted stock rights, are referred to herein as the "McGavick Excess Payments," or "Excess Payments."

**G.     The Transition Agreement Was Not Supported by Exercise of Business Judgment**

71.     The documents published in connection with the Transition Agreement reveal that the Board of Directors did not understand that by resigning McGavick had forfeited virtually all rights to compensation, including bonuses and stock options, under the 2005 Employment Contract. It shows ignorance of the fact that the use of the term "employee" in the Transition Agreement more than doubled that agreement's equity grant to McGavick. It showed a lack of understanding that McGavick was already contractually required to remain as CEO through December 31, 2005 and McGavick could not require that the Company provide him with a multi-million-dollar payout to do so. It ignored the facts that McGavick was already contractually prohibited from competing with Safeco for one year, he was going to be involved full-time in his senatorial campaign for that year, and if successful would be a sitting senator for six years.

72.     Ultimately, the termination payment made to McGavick was fundamentally unreasonable and contrary to Safeco's interests. The Director Defendants' failure to subject McGavick's transition payments to the compensation principles they previously adopted is

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  evidence that the payouts breached these Defendants' duties to Safeco, and in approving such

2  payments they committed corporate waste. The payments are thus removed from the business

3  judgment rule.

73.  The Transition payments also violated other promises set forth in proxy materials.

For example, the Director Defendants promised that the compensation programs would be set "to

motivate employees to achieve superior performance and shareholder value." Paying McGavick,

as set forth above, accomplished neither of these goals. Indeed, no "preestablished performance

goals and objectives" were established for McGavick in this period, both of which were to be set,

according to the proxy materials, before awarding compensation.

74.  The proxy materials promised that as part of the compensation process the Board

received information from three independent consulting firms. On information and belief, no

such information was provided with respect to the compensation rewarded.

**H.   The 2006 Proxy Statement Concealed the Amount and Extraordinary Nature of the Payments Made Under the Transition Agreement**

75.  On May 24, 2006, the Director Defendants filed Form DEF 14A ("2006 Proxy

Statement") with the SEC. The 2006 Proxy Statement was materially misleading in that it

concealed both the value of the payments made under the Transition Agreement and their

extraordinary nature.

76.  The 2006 Proxy Statement sought to normalize the multi-million dollar payout of

bonuses and stock options to McGavick under the Transition Agreement, and failed to disclose

the material fact that pursuant to the 2005 Employment Contract, McGavick's voluntary

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS  - 23
Case No.
006098-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1 | resignation caused him to forfeit such benefits.  This omission made the entire discussion

2 | misleading.  *See* 2006 Proxy Statement at pp. 25-26, 36.[11]

3 |     77.    The discussion of the salary reduction under the Transition Agreement was also

4 | misleading:

> **Terms of Transition Services Agreement.  *The agreement
> reduced Mr. McGavick's annual base salary from $1,150,000 to
> $750,000 effective December 1, 2005, and effective January 1,
> 2006, it further reduced his annual base salary to $100,000.
> These reductions reflected his reduced responsibilities*** in
> connection with his resignation as Chairman and CEO and our
> appointment of Paula Rosput Reynolds as our new President and
> CEO.

2006 Proxy Statement at p. 24 (emphasis added).  The suggestion that the salary reduction to

$100,000 was justified by McGavick's "reduced responsibilities" is misleading given that Safeco

had justified paying McGavick millions of dollars of bonuses and stock options for this same

work.

    78.    The 2006 Proxy Statement misled shareholders about the extraordinary nature of

McGavick's $2.3 million bonus:

> *The agreement provided that Mr. McGavick would be eligible to
> receive a 2005 bonus based on:  (i) a smooth and orderly
> transition of the responsibilities of the chief executive officer;
> (ii) his commitment to remain employed and provide transitional
> support to Safeco through February 28, 2006*; and (iii) Safeco's
> financial and operating performance for 2005.  [2006 Proxy
> Statement at p. 36 (emphasis added).]

> *On February 15, 2006, we awarded Mr. McGavick a bonus with
> respect to 2005 of $2,314,180 based on these criteria.*  [*Id.* at p. 24
> (emphasis added).]

By referring to a "2005 bonus," the Proxy Statement led shareholders to believe that this was a

valid bonus granted under the 2005 Employment Contract, when in fact McGavick forfeited his

2005 bonus, and the $2.3 million bonus was granted as additional consideration for, at most, two

---

[11] The discussion on page 36 was misleading due to the numerous problems discussed in this section.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    months of part-time work.  Also, McGavick was already being *excessively* compensated for such

2    work.

3        79.    The 2006 Proxy Statement twice referred to McGavick remaining an employee

4    through February 28, 2006, to provide transition services.  It stated:

> Mike McGavick was our CEO throughout 2005.  He stepped down
> as CEO, president and chairman effective December 31, 2005.
> *Mr. McGavick remained an employee of Safeco through*
> *February 28, 2005, providing transition services.*

8    2006 Proxy Statement at p. 24 (emphasis added).  These references were materially misleading

9    because they omit the material fact that the "employee" status resulted in the transfer of millions

10   of dollars of equity and was granted as an artifice to conceal this transfer.  Moreover, they failed

11   to disclose that McGavick was not a bona-fide employee during this period.

12       80.    The 2006 Proxy Statement was artfully drafted to conceal the millions of dollars

13   of equity that vested in February 2006.  It stated:

> *Because Mr. McGavick agreed to (i) remain as Safeco's*
> *President and CEO until a successor was in place; (ii) provide*
> *transition services through February 28, 2006; and (iii) not*
> *compete with Safeco or solicit its employees for a period of three*
> *years following termination of his employment, we also*
> *accelerated the vesting of unvested options to purchase 210,298*
> *shares of Safeco common stock.*  These options would have vested
> under their original terms in May 2006.  Based on the closing share
> price of $51.51 on February 28, 2006, *this acceleration had a*
> *value to Mr. McGavick of approximately $3.3 million.  All other*
> *equity awards that were not vested as of February 28, 2006 were*
> *cancelled.  As a result, Mr. McGavick forfeited approximately*
> *$7.0 million in unvested equity awards based on the $51.51*
> *closing share price as of February 28, 2006.*

22   2006 Proxy Statement at p. 24 (emphasis added).

23       81.    This statement was carefully crafted to lead shareholders to believe that all

24   options not being accelerated were being forfeited.[12]  By sleight of hand, it concealed that the

25   _____

26   [12] In addition to the discussion quoted above, footnote (3) to the Year End Option Values table provided on
page 30 stated: "This acceleration [of 210,298 option shares] was tied to Mr. McGavick's remaining employed with
Safeco through February 28, 2006, and the acceleration occurred on that date." *Id.* at 30.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 25
Case No.
006498-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   Transition Agreement allowed McGavick to vest in millions of dollars of options in February

2   2006.

3       82.     The statement was misleading in providing false justification for the $3.3 million

4   acceleration of stock options. The rationale provided did not justify this payout.

5       83.     The 2006 Proxy Statement's discussion of equity transfer was also misleading:

6

7       **Equity.** *We awarded Mr. McGavick 72,848 PM-RSRs in March*
        *2005 for 2004 performance, which were to vest in four equal*
8       *annual installments beginning in February 2006.* The grant had
        a value on the date of grant of $3,587,036, but *because*
9       *Mr. McGavick's employment with Safeco terminated*
        *February 28, 2006, he forfeited three quarters of that grant.*
10      Mr. McGavick did not receive any PM-RSRs or other equity
        awards for 2005 performance.

11  2006 Proxy Statement at p. 24 (emphasis added). In addition to the issues discussed elsewhere,

12  this statement misled shareholders by normalizing the fact that McGavick was being allowed to

13  vest in $900,000 in RSRs awarded in March 2005. Under the unambiguous terms of the 2005

14  Employment Contract, option awards granted in 2005 were not to vest before 2008. 2005

15  Employment Contract.

16      84.     The 2006 Proxy Statement concealed the payment's extraordinary nature by

17  describing it in the context of a larger discussion of compensation policies. It stated that the

18  primary purposes of compensation was to "pay for performance" and "to attract and retain top

19  talent," and touted its "rational incentive program." *Id.* at pp. 19-21. It described the Equity

20  Compensation Program by highlighting that "grants are subject to time-based vesting to create an

21  incentive to stay with the company." *Id.* at p. 22. These assurances were provided in part to gain

22  support for the Board-recommended slate of Board candidates, but were ignored in awarding

23  excessive payments to McGavick.

24

25

26

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 26
Case No.
006098-11 120018 V2

1   **I.    Safeco Violated the 2005 Employment Contract Through its March 2005 Stock-
2          Option Grant to McGavick**

3       85.    In addition to the corporate waste discussed above, Safeco's Board ignored

4   provisions of the 2005 Employment Contract to the detriment of shareholders when it ignored

5   the negotiated limits on stock-option grants.

6       86.    In March 2005, Safeco granted McGavick 72,848 PM-RSRs, with a grant-date

7   value of $3,587,036. Under the terms of the 2005 Employment Contract, these stock options

8   were to vest on January 1, 2008, at the earliest. However, Safeco ignored this contract in

9   allowing one fourth of this stock-option grant to vest on February 28, 2006. This constituted an

10  improper payment of approximately $900,000.

11

12              **V.    DEMAND ON THE SAFECO BOARD IS EXCUSED AS FUTILE**

13      87.    No demand has been made by plaintiff on Safeco's Board with respect to Count I

14  because demand is excused as a matter of law. No demand is required for Count II, which

15  alleges a direct claim against Defendants for violating Section 14(a) by causing the Company to

16  publish a false and misleading proxy statement.

17      88.    Count I challenges a specific transaction that was approved of and/or acquiesced

18  to by a majority of the Board of Directors. The Board approved the Transition Agreement, and it

19  was the entire Board of Directors that breached their fiduciary duties and violated the law with

20  regard to that transaction. It would be futile to ask the Board to sue itself for the claims alleged

21  in this complaint. Demand is excused where a majority of the Board actively participates in or

22  acquiesces to a challenged transaction.

23

24      89.    No demand has been made by plaintiff on Safeco's Board to rectify the excessive

25  termination payment because the Transition Agreement and payments made thereunder were not

26



1    supported by the exercise of business judgment. They constituted corporate waste. They also

2    violated Safeco's compensation plans and policies as discussed herein. Demand is excused when

3    the challenged transaction was unsupported by business judgment and/or is an *ultra vires* act.

4         90.    Finally, demand is excused because the Board has a conflict of interest with

5    regard to prosecuting the instant action. This action challenges the Board's decision to ignore

6
7    limitations on the exercise of stock options including RSRs (defined *supra* at 15). These

8    limitations include the vesting requirements of RSRs and other option grants set forth in

9    McGavick's 2005 Employment Contract and in Safeco's compensation plans and policies. The

10   Board has a conflict of interest in shareholders' attempts to enforce such limitations. Every

11   Board member is issued a significant number of RSRs after each annual shareholder meeting and

12
13   these RSRs do not vest until the following annual shareholder meeting. 2006 Proxy Statement at

14   pp. 18-19. The 2005 award of RSRs to each board member was valued at $133,000. *Id.*

15   Mr. Brown was provided additional RSRs at the 2006 shareholder meeting. 2006 Proxy

16   Statement at p. 18. Therefore, every one of these directors upon their leaving the Board will

17   forfeit a significant value of RSRs unless the RSRs' vesting requirements are waived. They have

18   a direct and substantial financial interest in protecting Safeco's flexibility to waive RSR vesting

19
20   requirements even where Safeco receives no consideration in return, such as after McGavick or a

21   Board member resigns. This direct financial conflict of interest excuses demand on the Safeco

22   Board, since board members cannot be expected to adequately prosecute a claim that is contrary

23   to their own financial interests.

24
25
26

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

# VI.   COUNTS

## COUNT I

**Derivative Claim for Breach of Fiduciary Duty – Corporate Waste and *Ultra Vires* Acts**

91.     Plaintiff hereby realleges and incorporates the allegations in the preceding paragraphs as if fully set forth herein.

92.     Plaintiff brings this claim derivatively on behalf of Safeco. By reason of their positions as directors of Safeco and because of their ability to control the business and corporate affairs of Safeco, McGavick and the Director Defendants owed Safeco and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage Safeco in a fair, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Safeco and its shareholders equally and not in furtherance of theirs or other fiduciaries' personal interests or benefit. Each Safeco director owes to Safeco and its shareholders the fiduciary duty to exercise good faith and diligence in administrating Safeco and in using and preserving its property and assets, and the highest obligation of fair dealing.

93.     For the reasons stated herein, the Transition Agreement and the McGavick Excess Payments constituted corporate waste. Any payment made under the Transition Agreement was corporate waste. The value received by Safeco for McGavick's services was so inadequate in value that no person of ordinary, sound business judgment would deem it worth the price paid.

94.     There was no legitimate purpose whatsoever to approving the McGavick Excess Payments and in paying McGavick millions of dollars beyond that he was entitled to under his employment contract. His bonus had been forfeited and giving him a new $2.3 million bonus for two months of part-time work (at most) was corporate waste. His unvested options had been

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

forfeited.  Accelerating $3.3 million in options for at most two months of part-time work

constituted corporate waste.  This is true also of those millions of dollars of stock options that

vested under the artifice of extending McGavick's employment status beyond his resignation and

when he remained neither a bona-fide employee nor an employee within the meaning of his

Employment Contracts under which the awards were granted.

95.     By ignoring the 2005 Employment Contract in granting McGavick options with

vesting dates before 2008, the Board also committed corporate waste.

96.     Safeco and its shareholders have been harmed due to Defendants' breach of their

fiduciary duties in allowing corporate waste and/or *ultra vires* act.

### COUNT II

**Direct Claim For Violation of Section 14(A) of the Securities and Exchange Act of 1934**

97.     Plaintiff hereby realleges and incorporates the allegations in the proceeding

paragraphs as if fully set forth herein and brings this as a direct claim.

98.     The 2006 Proxy Statement sought shareholder approval for electing six directors.

It attached a list of the Directors' responsibilities that included a representation that it was a basic

responsibility of a director to discharge his or her duties in good faith in a manner that is "in the

best interests of Safeco."  This statement is misleading for failing to divulge that the McGavick

Excess Payments described above were not in Safeco's best interests and were contrary to the

compensation principles referred to elsewhere in the 2006 Proxy Statement.

99.     The 2006 Proxy Statement also represented that CEO compensation is based upon

the Compensation Committee's evaluation of both qualitative and quantitative factors, including

"actual performance of the business and fulfillment of business and financial goals."  This

statement is misleading for failing to disclose that the Director Defendants did not adhere to this

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS  - 30
Case No.
006098-11  120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

process with respect to the McGavick Excess Payments, and that the Excess Payments were not based on performance goals.

100.    The 2006 Proxy Statement disclosed that the Director Defendants must adhere to a Code of Business and Financial Conduct and Ethics, available at www.safeco.com/governance. The McGavick Excess Payments did not comport with the Code as set forth above, rendering the Proxy Statement misleading.

101.    The 2006 Proxy Statement represented that compensation was set to "retain and encourage employees to achieve superior performance." This is false and misleading because the McGavick Excess Payments were not set in this fashion.  There is no relation between the value of the McGavick Excess Payments and retaining McGavick and/or encouraging him to achieve superior performance.

102.    The 2006 Proxy Statement also repeated earlier promises to shareholders that compensation would be set by certain "core principles" that were not followed in awarding the McGavick Excess Payments.  There is no relation between the value of the McGavick Excess Payments and any of the core principles rendering the 2006 Proxy Statement false and misleading.

103.    The 2006 Proxy Statement is misleading in that it led shareholders to believe that executive compensation would be used to recruit and retain executives, and would be established based on certain core principles, without disclosing that the Board could and/or would grant millions of dollars of additional payments essentially as a farewell gift to an executive who had already resigned after having been generously compensated; or that the Board could ignore company rules of corporate governance in awarding compensation.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 31
Case No.
009695-11  120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623 0594

104.    The 2006 Proxy Statement is also misleading for failing to disclose that in approving the McGavick Excess Payments the Director Defendants departed from the objective factors established by Safeco's corporate governance charter as absolute principles that must be considered. In establishing the McGavick Excess Payments, the Director Defendants did not consider and establish financial goals for the transition period, did not evaluate his performance during the period, did not consider Safeco's relative performance in connection with these payments, and did not consider the value of similar awards to CEOs of comparable companies. The 2006 Proxy Statement disclosed none of these corporate-policy breaches. The Board's duty to "evaluate performance" in setting compensation could not have been fulfilled given the fact McGavick was a full-time candidate for the Senate during this period.

105.    The 2006 Proxy Statement is misleading in that it led shareholders to believe that RSRs and PSRs (defined *supra* at 15) and their vesting requirements would be used as a means to retain key executives, and that therefore their vesting would be tied to an employee's term of bona-fide employment. The Proxy Statement never suggested that "employee" status could be used as an artifice to grant millions of dollars of undeserved options to an employee that had already resigned and remained neither a key executive nor a bona-fide employee.

106.    The 2006 Proxy Statement is misleading as to the Termination Agreement and payments made thereunder because there is no disclosure that McGavick's salary and bonus and vesting were for what charitably would be called "part-time work" and that his bonus of $2,314,180 based on his actual work was completely disproportionate to the value provided Safeco.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 32
Case No.
006098-11  120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

107.   The 2006 Proxy Statement is also misleading because it failed to disclose McGavick's full 2006 compensation so that shareholders could properly consider whether those Director Defendants up for election should be reelected.  In McGavick's filings with the U.S. Senate he first disclosed total Safeco compensation in 2006 as $15,052,149.30.  In an amended disclosure, however, McGavick restated his total 2006 compensation as $28,397,122.  The Proxy Statement failed to disclose McGavick's total compensation even though this information would be material to a shareholder deciding whether to re-elect directors who had authorized the $28 million and/or the McGavick Excess Payments.

108.   Defendants caused the Company to make the false and misleading statements in the 2006 Proxy Statement to solicit shareholder support for reelecting certain of the Defendants as Safeco directors.

109.   The foregoing statements were material to Safeco shareholders' consideration of the election of directors.

110.   This claim is advanced only towards those Director Defendants that sat on the Board when the 2006 Proxy Statement was disseminated.

## VII.   CONCLUSION

**WHEREFORE**, plaintiff prays that the Court enter judgment in favor of Safeco and against Defendants on all counts as follows:

A.   Declaring that Defendants breached their fiduciary duties and committed corporate waste by authorizing what amounted to a termination payment to McGavick after he had voluntarily resigned and thereby forfeited such payment, including bonuses and options, and by authorizing McGavick to remain an "employee" for vesting purposes even after he ceased to be a bona-fide employee;

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 33
Case No.
006698-11 120018 V2

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

B.      Declaring that Defendants violated Section 14(a) of the Securities and Exchange Act of 1934 by publishing false and misleading statements in the Company's Proxy Statement in 2006;

C.      Requiring McGavick to account for all sums he received from Safeco during 2006, when he worked at most part time for two months;

D.      Imposing a constructive trust on payments received by McGavick from Safeco until such accounting can be made and, to the extent necessary, issuing a preliminary injunction to protect such assets pending the outcome of this action;

E.      Ordering McGavick and the Director Defendants to return the payments received from Safeco in 2006, or that portion that was illegal and/or improper, and ordering McGavick to return all compensation he received while in breach of his fiduciary duties to shareholders;

F.      Awarding plaintiff damages, together with pre- and post-judgment interest;

G.      Ordering the Directors Defendants to correct the 2006 Proxy Statement's misrepresentations by issuing a disclosure to shareholders that fully and accurately describes the McGavick Excessive Payments and how those Payments violated Safeco's compensation policies;

H.      Awarding plaintiff the costs and expenses incurred in this action, including, but not limited to, reasonable experts' and attorneys' fees; and

I.      Granting such other and further relief as may be just and proper.

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 34
Case No.
006098-11 120018 V2

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

DATED August 1, 2006.

HAGENS BERMAN SOBOL SHAPIRO LLP


By _____
     Steve W. Berman, WSBA #12536
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Knoll Lowney
SMITH & LOWNEY, p.l.l.c.
2317 East John Street
Seattle, WA 98112
Telephone: (206) 860-2124
Facsimile: (206) 860-4187

Attorneys for Plaintiffs

VERIFIED DERIVATIVE COMPLAINT FOR
VIOLATION OF THE EXCHANGE ACTS - 35
Case No.

006098-11  120018 V2

## **VERIFICATION**

I, Emma Schwartzman, have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify, under penalty of perjury, that the foregoing is true and correct.

Executed on this __28__ th day of July, 2006.

_____
Emma Schwartzman