1

2

3

4

5
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
6
AT SEATTLE

7
EMMA SCHWARTZMAN,

8
                    Plaintiff,

9
                                                        No. C06-1080P
        v.

10                                                      ORDER GRANTING DEFENDANTS'
MICHAEL S. MCGAVICK, et al.,                            MOTIONS TO DISMISS AND
11                                                      GRANTING PLAINTIFF LEAVE TO
                    Defendants,                         FILE AN AMENDED COMPLAINT

12
        and

13
SAFECO CORPORATION,

14
                    Nominal Defendant.

15

16

17
        In this action, Plaintiff Emma Schwartzman has brought shareholder derivative claims for

18
breach of fiduciary duty against directors of Safeco Corporation and against Safeco's former chief

19
executive officer Michael McGavick. Plaintiff also brings a direct claim against certain directors for

20
alleged violations of Section 14(a) of the Securities Exchange Act. Two motions are currently

21
pending before the Court: (1) a motion to dismiss by the Director Defendants (Dkt. No. 23), which

22
has been joined by nominal defendant Safeco Corporation; and (2) a motion to dismiss by Mr.

23
McGavick (Dkt. No. 26).

24
        Having reviewed the papers and pleadings submitted by the parties, and having heard oral

25
argument on the pending motions, the Court GRANTS the Director Defendants' motion to dismiss

1   and GRANTS Mr. McGavick's motion to dismiss.  However, the Court also grants Plaintiff's request

2   for leave to file an amended complaint.  Any amended complaint must be filed within <u>thirty (30) days</u>

3   of the date of this order.  The reasons for the Court's order are set forth below.

4                                           **Background**

5          In January 2001, Defendant Michael McGavick was appointed as Safeco Corporation's

6   president and chief executive officer (CEO).  Mr. McGavick signed an employment agreement at that

7   time.  In January 2005, he signed an amended and restated employment agreement.  The 2005

8   employment agreement provided that if Mr. McGavick voluntarily terminated his employment, he

9   "shall not be entitled to any payments hereunder" except for his unpaid base salary.   Under the 2005

10  agreement, Mr. McGavick could terminate his employment at any time upon giving "Notice of

11  Termination."  The term "Notice of Termination" was defined as meaning "at least thirty (30) days'

12  written notice of termination of Employee's employment, during which period Employee's

13  employment and performance of services will continue."  The 2005 agreement provided that the

14  effective date of the termination "shall be the date on which such 30-day period expires."

15         On July 18, 2005, Mr. McGavick announced plans to leave his position as Safeco's CEO

16  effective August 31, 2005, to run for the United States Senate.  Safeco notified the Securities &

17  Exchange Commission (SEC) of this announcement.  In late August 2005, however, Safeco notified

18  the SEC that the company had not yet completed its search for a new CEO and that Mr. McGavick

19  had agreed to retain the CEO title until a successor was named.

20         According to SEC filings, Safeco's board of directors took the following actions on December

21  1, 2005: (1) the board accepted Mr. McGavick's resignation as Safeco's CEO, president, chairman,

22  and director effective December 31, 2005; and (2) the board appointed Paula Rosput Reynolds as

23  CEO, president, and director effective January 1, 2006.  Notwithstanding Mr. McGavick's public

24  announcement in July 2005 that he planned to leave his CEO post effective August 31, 2005,

25  Plaintiff's complaint alleges that Mr. McGavick did not give "Notice of Termination" (as that term is

ORDER - 2

1  defined in the 2005 employment agreement) to Safeco at any time before December 1, 2005.

2  (Complaint ¶ 46).

3          On December 6, 2005, Safeco and Mr. McGavick entered into an "Executive Transition

4  Services Agreement," which superseded his 2005 employment agreement.  The Transition Agreement

5  stated that Mr. McGavick had "voluntarily announced his resignation as President and Chief Executive

6  Officer effective August 31, 2005, but following that announcement he agreed to remain in those

7  positions until a new President and Chief Executive Officer was named."  The agreement indicated

8  that Mr. McGavick had resigned as Safeco's president and CEO effective December 31, 2005.

9  However, the agreement stated that Mr. McGavick had "agreed to provide executive transition

10 services" to Safeco until February 28, 2006, which was designated as the "separation date."  The

11 agreement provided that Mr. McGavick "will remain an employee of Safeco and will provide such

12 transitional support to the successor Chief Executive Officer as the Safeco Board of Directors deems

13 appropriate."  The agreement also extended Mr. McGavick's non-competition agreement with Safeco

14 from one year (as provided in his 2005 employment contract) to three years.

15         The Transition Agreement included the following provisions regarding compensation for Mr.

16 McGavick:

17        (a)     Base Salary: Mr. McGavick's base salary for December 2005 was reduced to
                  $750,000.  As of January 1, 2006, his annual base salary was reduced to $100,000.
18

19        (b)     Bonus: The agreement provided that Mr. McGavick "may also be entitled to receive"
                  an annual bonus for 2005 in an amount to be determined in the discretion of the board,
20                based on: "(i) a smooth and orderly transition of the responsibilities of the Chief
                  Executive Officer, (ii) the Executive's commitment to remain with Safeco until the
                  Separation Date, (iii) the performance of Executive's duties [in rendering transitional
21                support], and (iv) Safeco's financial and operating performance for fiscal year 2005."
                  On February 15, 2006, Safeco awarded Mr. McGavick a bonus of $2,314,180.
22

23        (c)     Unvested Options:  Safeco accelerated Mr. McGavick's vesting of 210,298 stock
                  options that otherwise would not have vested until May 2006.  Both sides agree that
                  the accelerated vesting of these options was worth approximately $3.3 million to Mr.
24                McGavick.  Section 3.3(b) of the Transition Agreement stated that this provision was
                  "[i]n consideration of Executive (i) remaining employed as Safeco's President and CEO
25

ORDER - 3

until December 31, 2005, (ii) providing transition services through the Separation Date and (iii) agreeing not to compete with Safeco or solicit its employees" for three years.

(d)    <u>Vested Options</u>:   Section 3.3(a) of the agreement provided that Mr. McGavick "shall be considered an 'employee' of Safeco through the Separation Date for compensation purposes and under all employee benefit plans, programs, and arrangements, including without limitation the Safeco Long-Term Incentive Plan of 1997, as amended (the 'LTIP'). All stock options granted to the Executive under the LTIP, which are fully vested and non-forfeitable as of the Separation Date will be exercisable for three (3) months from the Separation Date."

With respect to the "Vested Options" provision, Plaintiff alleges that by deeming Mr. McGavick an employee of Safeco through February 28, 2006, the Transition Agreement permitted Mr. McGavick to vest a number of restricted stock rights (RSRs) and stock options that he otherwise would have forfeited if his employment with Safeco had terminated on December 31, 2005. In her complaint, Plaintiff alleges that Mr. McGavick "became vested in approximately $3 million in Restricted Stock Rights for remaining an employee into late February, the anniversary and vesting date for such grants." (Complaint at ¶ 65). Plaintiff also alleges that "under one stock-option grant, McGavick became vested in an additional $160,000 in options every month he remained an employee."[1] <u>Id.</u> (emphasis omitted). In addition, Plaintiff claims that the Transition Agreement allowed Mr. McGavick to vest an additional 72,848 "performance-measure restricted stock rights" (PM-RSRs) that were not supposed to vest before 2008. <u>Id.</u> at ¶ 83. In her responses to the motions to dismiss, Plaintiff also suggests that the Transition Agreement allowed Mr. McGavick to vest an additional $8.1 million in stock options that he otherwise would have forfeited if his employment at Safeco had terminated on December 31, 2005.

In March 2006, Safeco issued a proxy statement that sought shareholder approval for the election of six directors. Among other things, the 2006 Proxy Statement included a discussion of Mr. McGavick's compensation and the Transition Agreement. Plaintiff alleges that the 2006 Proxy

---

[1] In her responses to Defendants' motions to dismiss, Plaintiff clarified that this grant was worth $136,000 per month, rather than $160,000.

1  Statement includes false and misleading statements regarding Mr. McGavick's compensation, the

2  Transition Agreement, and Safeco's executive compensation policies.

3      Plaintiff filed this complaint on August 1, 2006.  Her complaint names the following members

4  of Safeco's board of directors as defendants:  (1) Joseph Brown; (2) Robert Cline; (3) Peter Currie;

5  (4) Maria Eitel; (5) Joshua Green III; (6) Kerry Killinger; (7) Gary Locke; (8) William Reed; (9) Judith

6  Runstad; and (10) G. Thompson Hutton.  Mr. McGavick is also named as a defendant, while Safeco

7  Corporation is identified as a "nominal defendant."

8                                  **Analysis**

9      Plaintiff's complaint raises two claims: (1) a derivative claim for breach of fiduciary duty

10  against the Directors and Mr. McGavick, which is brought under state law; and (2) a federal claim

11  under Section 14(a) of the Securities Exchange Act, which is brought against the directors who served

12  on the Safeco board when the 2006 Proxy Statement issued.

13      Defendants have moved to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b)(6).  Under

14  Rule 12(b)(6), the well-pleaded factual allegations in Plaintiff's complaint are accepted as true,

15  although "[c]onclusory allegations of law and unwarranted inferences" are not sufficient to defeat a

16  motion to dismiss.  In re Verifone Sec. Litig., 11 F.3d 865, 868 (9th Cir. 1993).  Both sides have made

17  unopposed requests for the Court to take judicial notice of documents referred to in Plaintiff's

18  complaint, as well as matters of public record such as SEC filings.  The Court grants the parties'

19  requests to take judicial notice of the documents submitted for consideration.

20  1.  Breach of Fiduciary Duty Claims

21      Plaintiff's first claim alleges that the Directors and Mr. McGavick breached their fiduciary

22  duties to Safeco.  Generally speaking, Plaintiff alleges that the Transition Agreement and "Excess

23  Payments" to Mr. McGavick constituted corporate waste and that Safeco and its shareholders "have

24  been harmed due to Defendants' breach of their fiduciary duties in allowing corporate waste and/or

25  *ultra vires* acts."  Complaint ¶¶ 93, 96.  The breach of fiduciary duty claims are brought under

1   Washington law, which imposes duties of loyalty, care, and good faith.  Grassmueck v. Barnett, 281 F.

2   Supp.2d 1227, 1232 (W.D. Wash. 2003).  Although Plaintiff's breach of fiduciary duty claims are

3   brought under Washington law, both sides rely largely on Delaware law in their briefing, noting the

4   well-developed nature of Delaware law in this area and the lack of applicable Washington case law.

5          A.      Pleading Standards

6          Plaintiff's breach of fiduciary duty claims are derivative claims brought by a shareholder on

7   behalf of the corporation.  Shareholder derivative claims are subject to the pleading requirements of

8   Fed. R. Civ. P. 23.1, which provides that a derivative complaint must "allege with particularity the

9   efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors . . . and

10  the reasons for the plaintiff's failure to obtain the action or for not making the effort."  The derivative

11  claims are also subject to the requirements of RCW 23B.07.400(2), which provides that a shareholder

12  bringing a derivative complaint must "allege with particularity the demand made, if any, to obtain

13  action by the board of directors and either that the demand was refused or ignored or why a demand

14  was not made."

15         Neither Rule 23.1 nor RCW 23B.07.400 spell out substantive demand requirements, which are

16  established by state law.  See Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 96 (1991) ("although

17  Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be

18  excused, it does not *create* a demand requirement of any particular dimension") (emphasis in original);

19  In re Cray, Inc., 431 F. Supp.2d 1114, 1119 (W.D. Wash. 2006) ("Washington state courts have not .

20  . . specifically adopted an underlying *substantive* demand requirement" under RCW 23B.07.400)

21  (emphasis in original).  However, Judge Zilly of this Court recently concluded that "the Washington

22  State Supreme Court would likely adopt the substantive demand requirement and apply a similar, if

23  not the same, exception for futility as that employed in Delaware."  Cray, 431 F. Supp.2d at 1120.

24  The parties agree with Judge Zilly's analysis of this point.

25

ORDER - 6

1   In this case, Plaintiff did not make a pre-suit demand on the Directors.  However, she argues

2   that her failure to make demand should be excused as futile.  Under Delaware law, demand is excused

3   as futile only when "under the particularized facts alleged, a reasonable doubt is created that: (1) the

4   directors are disinterested and independent" or "(2) the challenged transaction was otherwise the

5   product of a valid exercise of business judgment."  Aronson v. Lewis, 473 A.2d 805, 814 (Del. 1984),

6   overruled on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del. 2000).  In response to

7   Defendants' motions to dismiss, Plaintiff does not contend that there is a reasonable doubt that a

8   majority of the board was disinterested and independent.  Instead, she relies on the second Aronson

9   prong – i.e., that there is a reasonable doubt that the challenged transaction was the product of a valid

10  exercise of business judgment.

11          Delaware courts have noted the difficulty in pleading sufficient facts to create a reasonable

12  doubt that a transaction was a valid exercise of business judgment, particularly for claims alleging

13  corporate waste.  As one court has noted, "[t]o allege a claim of waste sufficient to satisfy the criteria

14  of Aronson and Rule 23.1, the particularized pleaded facts must show that the consideration received

15  by [the corporation] in the transaction 'was so inadequate that no person of ordinary, sound business

16  judgment would deem it worth that which the corporation paid.'"  Grobow v. Perot, 526 A.2d 914,

17  928 (Del. Ch. 1987).  Delaware courts have characterized this as "'an extreme test, very rarely

18  satisfied by a shareholder plaintiff,' because 'if under the circumstances any reasonable person might

19  conclude that the deal makes sense, then the judicial inquiry ends.'"  Zupnick v. Goizueta, 698 A.2d

20  384, 387 (Del. Ch. 1997).

21          B.      Breach of Fiduciary Duty Claim Against Directors

22          Plaintiff acknowledges that the Court must "presume that 'in making a business decision the

23  directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the

24  action taken was in the best interests of the company.'" (Pl.'s Opp. to Directors' Motion at 5)

25  (quoting In re Walt Disney Co. Deriv. Litig., 906 A.2d 27, 52 (Del. 2006)).  To overcome this

presumption, "plaintiffs must plead particularized facts sufficient to raise: (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." In re the Walt Disney Co. Deriv. Litig., 825 A.2d 275, 286 (Del. Ch. 2003).

Plaintiff's breach of fiduciary duty claim against the Directors is premised on a theory that the Directors committed corporate waste in approving the Transition Agreement. The Delaware Supreme Court recently described the "onerous standard" for maintaining a claim of corporate waste:

> To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was "so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." A claim of waste will arise only in the rare "unconscionable case where directors irrationally squander or give away corporate assets." This onerous standard for waste is a corollary of the proposition that where business judgment presumptions are applicable, the board's decision will be upheld unless it cannot be "attributed to any rational business purpose."

Disney, 906 A.2d at 74 (internal citations omitted). The determination of whether the directors committed waste must be measured at the time the transaction was made. See, e.g., Ash v. McCall, 2000 WL 1370341 at *8 (Del. Ch. Sept. 15, 2000) (noting that "the relevant time to measure whether [a board of directors] committed 'waste' is at the time they entered into and approved the transaction").

In this case, it is clear that Safeco received consideration from Mr. McGavick under the Transition Agreement. At a minimum, Safeco received: (1) an extension of Mr. McGavick's non-competition agreement from one year to three years; and (2) Mr. McGavick's executive transition services for January and February of 2006.[2]  It is not difficult to conceive how a business person of ordinary, sound judgment could assign a high value to securing transition services from a departing CEO and from tripling the length of a non-competition agreement for a former CEO.

_____

[2]  Defendants also suggest that the consideration received by Safeco under the Transition Agreement included Mr. McGavick's agreement to postpone his resignation as CEO until a replacement could be found.

Plaintiff questions the adequacy of the consideration received by Safeco under the Transition Agreement, noting that Mr. McGavick was leaving the company to run for the Senate, would be engaged in his campaign after leaving Safeco, and would be a sitting senator for six years if his campaign was successful. However, as the Delaware Supreme Court has noted:

> [A] corporate waste claim must fail if "there is *any substantial* consideration received by the corporation, and . . . there is a *good faith judgment* that in the circumstances the transaction is worthwhile." This is so even if the transaction appears, with hindsight, to be unreasonably risky to a reviewing court. As we have observed, "courts are ill-fitted to attempt to weigh the 'adequacy' of consideration under a waste standard or, *ex post*, to judge appropriate degrees of business risk." Thus, absent some reasonable doubt that the . . . board proceeded based on a good faith assessment of the corporation's best interests, the board's decisions are entitled to deference under the business judgment rule.

White v. Panic, 783 A.2d 543, 554 (Del. 2001) (internal citations omitted) (emphasis in original).

In her complaint, Plaintiff asserted without qualification that "[a]ny payment made under the Transition Agreement was corporate waste." (Complaint ¶ 93). In her responses to the pending motions, however, Plaintiff suggests that she is not challenging the Transition Agreement in its entirety as corporate waste. Instead, Plaintiff states in her opposition to the Directors' motion to dismiss:

> Schwartzman does not contest the Director Defendants' ability to award reasonable compensation for McGavick's transition services, and hence the portion of McGavick's compensation under the Transition Agreement directed to that purpose is not at issue. Schwartzman instead focuses solely on the Director Defendants' decision to use the Transition Agreement to reward McGavick for his past performance.

(Pl.'s Opp. to Directors' Motion at 11-12 n.2). Plaintiff makes a similar statement in her opposition to Mr. McGavick's motion. See Pl.'s Opp. to McGavick Motion at 12 (stating that Plaintiff is only challenging compensation that Mr. McGavick received as a reward for his past performance). In essence, Plaintiff suggests that compensation awarded for past performance under the Agreement would constitute corporate waste because it was not supported by consideration.

To support this argument, Plaintiff points to Green v. Phillips, 1996 WL 342093 (Del. Ch. June 19, 1996). In Green, the court denied a motion to dismiss a corporate waste claim where an executive severance agreement explicitly identified the consideration provided for certain aspects of

the agreement, while failing to identify any specific consideration for other provisions of the

agreement.  At oral argument, Plaintiff suggested that Safeco received no consideration in exchange

for Mr. McGavick's compensation under Section 3.3(a) of the Transition Agreement.  That portion of

the agreement, titled "vested options," provided that Mr. McGavick would remain an employee of

Safeco through February 28, 2006 "for compensation purposes and under all employee benefit plans,

programs, and arrangements, including without limitation the Safeco Long-Term Incentive Plan of

1997, as amended (the 'LTIP')."  Plaintiff argues that Section 3.3(a) of the agreement allowed Mr.

McGavick to vest at least several million dollars in stock options and restricted stock rights (RSRs)

that would not have otherwise vested if his Safeco employment had terminated on December 31,

2005.  Plaintiff alleges that by retaining Mr. McGavick an employee through February 28, 2006, the

Transition Agreement permitted him to vest:

    (1)    18,212 in performance-measure restricted stock rights (PM-RSRs) in February 2006 worth $938,100[3];

    (2)    78,823 options on January 24, 2006 worth $1,433.790.37;

    (3)    33,900.25 RSRs in January or February 2006 worth $1,746,201.87; and

    (4)    At least 5,000 shares of 300,000 stock options granted at hire in 2001, worth $136,000.

See Pl.'s Opp. to McGavick Motion at 7-8 and A2.

       The Court is not persuaded that Green supports Plaintiff's theory that Safeco received no

consideration for compensation under Section 3.3(a) of the Transition Agreement.  Putting aside the

fact that Green is an unpublished trial court decision, the situation presented here is distinguishable

from Green because the Transition Agreement adequately recites consideration received by Safeco in

---

   [3] In her complaint, Plaintiff alleged that none of these PM-RSRs (which were awarded in March 2005) were supposed to vest until at least January 1, 2008.  (Complaint at ¶ 86).  However, the Directors have pointed to documents indicating that these PM-RSRs were to vest in four equal annual installments beginning February 15, 2006.  See Directors' Request for Judicial Notice, Ex. G. at 339 and n.3.

exchange for the compensation received by Mr. McGavick, including compensation under Section 3.3(a) of the Transition Agreement.  For example, Section 3 of the Transition Agreement provides that "[u]ntil the Separation Date, Safeco agrees to pay or cause to be paid to Executive, and Executive agrees to accept in exchange for the services rendered by him, the following compensation . . . ."  The agreement then lists various forms of compensation that Mr. McGavick would receive "in exchange for the services rendered by him," including compensation under Section 3.3(a).

While Plaintiff questions the adequacy of consideration received by Safeco, the Directors observe that Delaware courts have held that "[i]t is the essence of business judgment for a board to determine if a particular individual warrant[s] large amounts of money, whether in the form of current salary or severance provisions.'" Brehm, 746 A.2d at 263 (internal quotation marks omitted).  As one example, Defendants note that in Steiner v. Meyerson, 1995 WL 441999 at *4 (Del. Ch. July 19, 1995), the court dismissed a claim for corporate waste based on an allegedly overgenerous executive severance agreement, noting "[t]he gist of the complaint is that these deals pay [the former CEO] too much for too little.  That question however is the essence of business judgment."

Defendants also note that Delaware courts have held a corporation may reward an executive for past performance without committing waste.  In Zupnick v. Goizueta, 698 A.2d 384 (Del. Ch. 1997), for instance, a plaintiff sued the directors of Coca-Cola after they awarded the company's CEO one million immediately-exercisable stock options for his past performance.  Although the court noted a "general rule" against awarding retroactive compensation to an officer, the court indicated that there was a "well recognized exception" to this rule when "the amount awarded is not unreasonable in view of the services rendered."  Id. at 388.  As such, retroactive compensation is permissible if "reasonable, disinterested directors could have concluded" that the officer's past services were of sufficient benefit and magnitude to the corporation.  Id.  Here, Defendants have offered a number of documents subject to judicial notice to demonstrate that Safeco's performance improved quite significantly during Mr. McGavick's tenure.

1    In her opposition briefs, Plaintiff also suggests that allowing Mr. McGavick to remain an

2    employee of Safeco through February 2006 may have permitted him to vest an additional 300,000 in

3    stock options worth $8.1 million that he otherwise would have forfeited if his employment had

4    terminated on December 31, 2005.  This assertion, which was not specifically pleaded in her

5    complaint, appears to be based on the following theory: (1) when Mr. McGavick was hired in January

6    2001, he signed an employment agreement that granted him 300,000 stock options that would not

7    fully vest for five years; (2) because the Transition Agreement designated Mr. McGavick as an

8    employee through February 2006, he was allowed to fully vest this stock option grant; and (3) as of

9    February 28, 2006, the 300,000 stock option grant was worth $8.1 million.

10    It is true that the 2001 employment agreement provided that the 300,000 stock option grant

11    would fully vest on the fifth anniversary of the grant.  However, the agreement also specifically

12    provided that vesting would be accelerated "if Employee's employment terminates **for any reason**

13    **after the third anniversary of the Effective Date**, in a percentage equivalent to the number of whole

14    months (with February 2001 being the first month) from the Effective Date to the date of termination

15    divided by 60." (emphasis added).  Here, it is undisputed that Mr. McGavick worked more than three

16    years at Safeco.  As a result, the accelerated-vesting provision by its express terms would have

17    allowed Mr. McGavick to terminate his employment "for any reason" on December 31, 2005 and still

18    receive virtually all of the grant – i.e., 59 out of 60 months.  Plaintiff points to Section 6.2 of the 2001

19    agreement, which provides that "[i]n the case of the termination of Employee's employment by

20    Employee, Employee shall not be entitled to any payments hereunder," other than unpaid base salary.

21    However, this provision cannot be reasonably interpreted to nullify the clear and specific vesting

22    provisions for the 300,000 stock option grant, which expressly provides that vesting of the options

23    would be accelerated if Mr. McGavick's employment terminated "for any reason" after the third

24    anniversary of its effective date.

25

Taking a different approach, Plaintiff suggests that demand should be excused because the Directors were not adequately informed about the true cost of the Transition Agreement.  In her complaint, she alleges:

> The documents published in connection with the Transition Agreement reveal that the Board of Directors did not understand that by resigning McGavick had forfeited virtually all rights to compensation, including bonuses and stock options, under the 2005 Employment Contract.  It shows ignorance of the fact that the use of the term "employee" in the Transition Agreement more than doubled that agreement's equity grant to McGavick.  It showed a lack of understanding that McGavick was already contractually required to remain as CEO through December 31, 2005 and McGavick could not require that the Company provide him with a multi-million-dollar payout to do so.  It ignored the facts that McGavick was already contractually prohibited from competing with Safeco for one year, he was going to be involved full-time in his senatorial campaign for that year, and if successful would be a sitting senator for six years.

(Complaint at ¶ 71).

In response, the Directors argue that Plaintiff "fails to allege any particularized facts establishing that the directors did not understand or inform themselves of the terms of the 2005 Employment Agreement or of the value of the compensation that Mr. McGavick would receive under the Transition Agreement."  (Directors' Reply at 8).  As the Directors note, "[p]re-suit demand will be excused . . . only if the Court . . . conclude[s] that the particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decision making process, *measured by concepts of gross negligence*, included consideration of all material information reasonably available."  Brehm, 746 A.2d at 259 (emphasis in original).  The Directors also note they obtained opinions regarding the terms of the Transition Agreement from two executive compensation consultants.  (2006 Proxy Statement at 20).

The Court agrees with the Directors that Plaintiff has not pleaded sufficiently particularized facts to create a reasonable doubt that the Directors failed to consider all material information reasonably available in approving the Transition Agreement.  Instead, Plaintiff makes conclusory allegations that unidentified "documents published in connection with the Transition Agreement"

1   reveal the Board's supposed ignorance.  Plaintiff's conclusory allegations that the Board was

2   uninformed are not sufficiently particularized to excuse demand.

3          Finally, Plaintiff points to <u>Michelson v. Duncan</u>, 407 A.2d 211, 223 (Del. 1979), a case where

4   the court noted that determining whether a corporate exchange is "fair" is "obviously not a mere

5   question of law."  However, as the Directors note, <u>Michelson</u> did not address the question of whether

6   pre-suit demand should be excused as futile under Rule 23.1 or the <u>Aronson</u> test.  Plaintiff also relies

7   on <u>International Insurance Co. v. Johns</u>, 874 F.2d 1447 (11th Cir. 1989), a case where the court

8   considered an insurer's coverage obligations for settlement of a corporate waste claim.  However, this

9   case also does not involve pre-suit demand standards in a derivative shareholder's claim.

10         In sum, the Court finds that Plaintiff has not satisfied the demand futility requirements of Rule

11  23.1 and the <u>Aronson</u> test.  Plaintiff has not pleaded particularized facts sufficient to create a

12  reasonable doubt that no business person of ordinary, sound judgment would have approved the

13  Transition Agreement, nor has she pleaded sufficient facts to create a reasonable doubt that the

14  Directors were uninformed.  Therefore, Plaintiff's derivative claims against the Directors for breach of

15  fiduciary duty are subject to dismissal.

16         C.      Breach of Fiduciary Duty Claim Against Mr. McGavick

17         Plaintiff has also brought a derivative breach of fiduciary duty claim against Mr. McGavick.  In

18  essence, Plaintiff's claim against Mr. McGavick is based on allegations that he breached his fiduciary

19  duties to Safeco by negotiating a one-sided transition agreement that allegedly wasted Safeco's assets.

20  For the reasons stated above, however, the Court finds that Plaintiff has failed to plead sufficient facts

21  to excuse her failure to make demand on the board regarding her derivative claims.  As a result, her

22  derivative claim against Mr. McGavick is also subject to dismissal.

23         One additional point bears noting with respect to Mr. McGavick's motion.  In her opposition

24  to Mr. McGavick's motion to dismiss, Plaintiff again argues that the board was uninformed about the

25  true costs of the Transition Agreement.  As Mr. McGavick suggests, Plaintiff does little more than

1    speculate that the Board could not have been fully informed simply because they approved the

2    transaction. Plaintiff even suggests that Defendant Gary Locke, a former Washington governor and a

3    Safeco board member, could not have been informed of the true costs of the Transition Agreement

4    because he is a Democrat and would not have approved an agreement that provided Mr. McGavick (a

5    Republican) with so much money to subsidize his Senate race. This brazen suggestion is nothing more

6    than bare speculation on Plaintiff's part, not supported by any fact.

7         Therefore, Plaintiff's derivative breach of fiduciary duty claim against Mr. McGavick will be

8    dismissed along with her derivative claims against the Directors.

9    2.    Section 14(a) Claim

10        Plaintiff also brings a claim under Section 14(a) of the Securities Exchange Act, 15 U.S.C. §

11   78n(a). Section 14(a) prohibits the solicitation of proxy votes "in contravention of such rules and

12   regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

13   protection of investors." 15 U.S.C. § 78n(a). In turn, SEC Rule 14a-9 prohibits proxy solicitation "by

14   means of any proxy statement . . . containing any statement which, at the time and in the light of the

15   circumstances under which it is made, is false or misleading with respect to any material fact, or which

16   omits to state any material fact necessary in order to make the statements therein not false or

17   misleading."

18        Plaintiff bases her Section 14(a) claim on allegedly false or misleading statements made in a

19   proxy statement issued by Safeco in March 2006. The 2006 Proxy Statement solicited shareholder

20   votes on two proposals: (1) the election of six directors running unopposed; and (2) ratification of the

21   appointment of an independent registered public accounting firm. The 2006 Proxy Statement did not

22   solicit votes on the Transition Agreement, although it included a discussion of the agreement.

23        Plaintiff's Section 14(a) claim is a direct claim and is brought only against the directors who

24   served on the Safeco board when the 2006 Proxy Statement was issued. As a direct claim, it is not

25   subject to the pleading requirements for derivative claims under Rule 23.1. However, it is subject to

ORDER - 15

1   the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA), which

2   provides that a plaintiff must identify "each statement alleged to have been misleading, [and] the

3   reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).

4          Plaintiff states that she is seeking only equitable relief under Section14(a).  In her prayer for

5   relief, she asks the Court to order "the Director Defendants to correct the 2006 Proxy Statement's

6   misrepresentations by issuing a disclosure to shareholders that fully and accurately describes the

7   McGavick Excessive Payments and how those Payments violated Safeco's compensation polices."

8   (Complaint at 34).  Elsewhere in her complaint, she states that she "seeks a corrective proxy statement

9   and a new election of these directors pursuant to a fair proxy statement."  Id. at ¶ 13.

10         To maintain a Section 14(a) claim, a plaintiff must demonstrate the materiality of the allegedly

11  false or misleading statement.  See, e.g., Desaigoudar v. Meyercord, 223 F.3d 1020, 1025 (9th Cir.

12  2000) ("there can be no Section 14(a) liability without materiality").  As the Director Defendants note,

13  the Ninth Circuit has held that when a plaintiff brings a claim for equitable relief under Section 14(a)

14  relating to the election of directors, the proper analysis is materiality.  Gaines v. Haughton, 645 F.2d

15  761, 776 (9th Cir. 1981), implied overruling recognized by Stahl v. Gibraltar Fin. Corp., 967 F.2d 335

16  (9th Cir. 1992).[4]  The Gaines court held that in analyzing materiality:

17         We draw a sharp distinction . . . between allegations of director misconduct involving breach
           of trust or self-dealing the nondisclosure of which is presumptively material and allegations of
18         simple breach of fiduciary duty/waste of corporate assets the nondisclosure of which is never
           material for § 14(a) purposes.

19

20

---

21         [4] Both sides cited Gaines in their briefs, with Plaintiff citing the decision first.  The Court

22  asked the parties at oral argument to address whether Gaines is still good law.  In its 1992 Stahl
    decision, the Ninth Circuit concluded that Gaines had been overruled by Virginia Bankshares, Inc. v.

23  Sandberg, 501 U.S. 1083 (1991).  However, the provision of Gaines that the Stahl court discussed
    concerned a shareholder's standing to maintain a Section 14(a) claim.  Stahl, 967 F.2d at 338.  The

24  Stahl court did not address the Gaines court's analysis of materiality issues.  As such, it does not
    appear that the Stahl court found that Gaines had been overruled in its entirety by Virginia

25  Bankshares.

1    Id. at 776-77.  The Gaines court concluded that "[a]bsent credible allegations of self-dealing by the

2    directors or dishonesty or deceit which inures to the direct, personal benefit of the directors . . . we

3    hold that director misconduct of the type traditionally regulated by state corporate law need not be

4    disclosed in proxy solicitations for director elections." Id. at 779.  Instead, the court stated that "[t]his

5    type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the

6    ambit of the federal securities law." Id.  In a similar vein, courts have rejected claims under Section

7    14(a) that are essentially breach of fiduciary duty claims alleging mismanagement by directors.  See,

8    e.g., Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999) ("We have long recognized that no

9    general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty"); Cowin v.

10   Bressler, 741 F.2d 410, 428 (D.C. Cir. 1986) (similar).

11           Under Gaines and similar authority, the Section 14(a) claims alleged in Plaintiff's complaint are

12   flawed.  For example, Plaintiff's complaint alleges:

13           The 2006 Proxy Statement sought shareholder approval for electing six directors.  It attached a
             list of the Directors' responsibilities that included a representation that it was a basic
14           responsibility of a director to discharge his or her duties in good faith in a manner that is "in
             the best interests of Safeco."  This statement is misleading for failing to divulge that the
15           McGavick Excess Payments described above were not in Safeco's best interests and were
             contrary to the compensation principles referred to elsewhere in the 2006 Proxy Statement.
16

17   (Complaint ¶ 98).  Contrary to Gaines, this allegation is little more than an attempt to present a breach

     of fiduciary duty claim as a Section 14(a) claim.
18

19           Plaintiff's complaint also alleges that the 2006 Proxy Statement is misleading because it fails to

20   disclose that Mr. McGavick's "salary and bonus and vesting" were "completely disproportionate to

21   the value provided Safeco." Id. at ¶ 106.  She also makes a litany of allegations that the proxy

22   statement was false or misleading because the Directors supposedly failed to disclose that they had

23   departed from Safeco's executive compensation policies or code of ethics by approving the Transition

24   Agreement.  Id. at ¶¶ 99-105.  As before, these are essentially allegations that the Directors failed to

25

ORDER - 17

1   disclose alleged breaches of their fiduciary duties in the 2006 Proxy Statement, which are not sufficient

2   under Gaines to support a Section 14(a) claim.

3        Plaintiff also alleges that the 2006 Proxy Statement was "misleading because it failed to

4   disclose McGavick's full 2006 compensation so that shareholders could properly consider whether

5   those Director Defendants up for election should be reelected." Id. at ¶ 107.  Plaintiff bases this

6   allegation on the fact that Mr. McGavick filed a disclosure in his Senate race indicating that he had

7   received $28,397,122 from Safeco in 2006.  Id.

8        However, the Directors note that the 2006 Proxy Statement disclosed that as of February 28,

9   2006, Mr. McGavick owned 1,126,492 Safeco shares acquirable within 60 days.  The Directors have

10   appended a chart to their reply brief indicating that the value of these shares exceeded $22 million.

11   The 2006 Proxy Statement also disclosed Mr. McGavick's base salary for 2006, as well as the value of

12   the bonus ($2.3 million) and accelerated vesting of options ($3.3 million) granted under the Transition

13   Agreement.  It also disclosed that Mr. McGavick remained an employee of Safeco through February

14   28, 2006.  To be sure, the Proxy Statement did not expressly state that because Mr. McGavick

15   continued as a Safeco employee through February 2006, he remained eligible to vest additional

16   restricted stock rights and stock options which had been awarded in previous years and which were

17   scheduled to vest in January or February 2006.  However, the award of these RSRs and stock options

18   had been disclosed in earlier proxy statements, including a description of their vesting provisions.

19        Although not specifically alleged in her complaint, Plaintiff also suggests in her opposition to

20   the Directors' motion to dismiss that the 2006 Proxy Statement violated 17 C.F.R. § 229.402, an SEC

21   regulation that governs disclosure of executive compensation.  In her briefing, Plaintiff points to 17

22   C.F.R. § 229.402(b)(1)(iv),[5] which Plaintiff states "requires the disclosure's discussion to explain 'all

23

24

25        [5] Plaintiff's brief cites to Section 229(b)(iv), rather than Section 229(b)(1)(iv).

material elements of the registrant's compensation of named executive officers,' including '[w]hy the registrant chooses to pay each element' of compensation."  (Pl.'s Opp. to Directors' Motion at 17).

However, Plaintiff's citation in her brief to 17 C.F.R. § 229.402(b)(1)(iv) appears to refer to an amended version of the regulation that took effect after the 2006 Proxy Statement issued in March 2006.  See 71 Fed. Reg. 53158 (Sept. 8, 2006).  Similarly, at oral argument Plaintiff presented a handout to the Court that highlighted various provisions of the amended version of Section 229.402, rather than provisions of the regulation in effect when the 2006 Proxy Statement issued.  As a result, Plaintiff has not pointed to any alleged violations of the version of Section 229.402 that was in effect at the time the 2006 Proxy Statement issued.  The Court is not in a position to compare the regulations that were in effect when the 2006 Proxy Statement issued to the amended regulations cited by Plaintiff.

For these reasons, the Court finds that Plaintiff has failed to state a claim for a violation of Section 14(a) of the Securities Exchange Act.  The Court therefore grants the Director Defendants' motion to dismiss the Section 14(a) claim.

3.    Leave to Amend

Finally, Plaintiff's opposition to Mr. McGavick's motion to dismiss includes a request for leave to file an amended complaint.  Defendants argue that leave to amend should not be granted.  The only authority Defendants cite for this argument is White v. Panic, 783 A.2d 543 (Del. 2001).  In White, the Delaware Supreme Court stated that "[a]s a general proposition, a plaintiff is not permitted to amend a derivative suit complaint after this Court affirms the [trial court's] judgment dismissing the complaint."  Id. at 555.

Defendants provide little basis for the Court to conclude that the rule announced in White would apply when leave to amend is requested at the trial court level.  It is also questionable that White would be applicable to a case brought in federal court in which the requirements of Fed. R. Civ.

1   P. 15 govern the amendment of pleadings.  In any case, the <u>White</u> decision would be inapplicable in

2   determining whether Plaintiff should be allowed to amend her direct claim under Section 14(a).

3          Fed. R. Civ. P. 15(a) provides that a party may amend its pleading once as a matter of course

4   at any time before a responsive pleading is served.  Here, none of the Defendants have filed an answer

5   to Plaintiff's complaint.  It is well-established that a motion to dismiss is not a responsive pleading

6   under Rule 15(a), and the Ninth Circuit has held that "'[n]either the filing nor granting of such a

7   motion before answer terminates the right to amend; an order of dismissal denying leave to amend at

8   that stage is improper.'"  <u>See</u> <u>Doe v. United States</u>, 58 F.3d 494, 497 (9th Cir. 1995) (quoting

9   <u>Schreiber Distrib. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)); <u>see also</u> <u>Nolen</u>

10  <u>v. Fitzharris</u>, 450 F.2d 958, 958-99 (9th Cir. 1971) (district court erred in granting motion to dismiss

11  without leave to amend where defendant had filed no answer and plaintiffs indicated in briefs that they

12  wished to file an amended complaint).

13         Even after a responsive pleading is served, Rule 15(a) provides that leave to amend must be

14  freely given when justice so requires.  As Plaintiff notes, the Ninth Circuit has emphasized that leave to

15  amend should be granted, even if no request is made, unless the Court "determines that the pleading

16  could not possibly be cured by the allegation of other facts."  <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127

17  (9th Cir. 2000).  Here, it is not clear to the Court that Plaintiff could not possibly cure the defects in

18  her complaint by the allegation of additional facts.

19         Therefore, Plaintiff will be permitted to file an amended complaint if she so chooses, provided

20  that any amended complaint must be filed within <u>thirty (30) days</u> of the date of this order.

21                                          **Conclusion**

22         For the reasons stated above, the Court GRANTS the Director Defendants' motion to dismiss

23  and GRANTS Mr. McGavick's motion to dismiss.  With respect to her derivative claims, Plaintiff has

24  not sufficiently pleaded particularized facts to excuse her failure to make demand on the Safeco board

25  prior to filing this lawsuit.  Plaintiff has also failed to plead sufficient facts to state a claim under

ORDER - 20

1    Section 14(a) of the Securities Exchange Act.  However, consistent with Fed. R. Civ. P. 15(a), the

2    Court grants Plaintiff's request for leave to file an amended complaint.  Any amended complaint must

3    be filed within <u>thirty (30) days</u> of the date of this order.

4            The clerk is directed to send copies of this order to all counsel of record.

5            Dated:   April 19, 2007

6

7                                   <u>s/Marsha J. Pechman</u>
                                    Marsha J. Pechman

8                                   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ORDER - 21